IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

TBB GLOBAL LOGISTICS, INC.,

    Plaintiff,

    v.                         CIVIL NO.: WDQ-13-1428

ICAT LOGISTICS, INC., et al.,

    Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

TBB Global Logistics, Inc. ("TBB") sued ICAT Logistics, Inc. ("ICAT") and Ann Bruno (collectively, the "defendants") for trade secret and contract claims. Pending is TBB's motion for a temporary restraining order ("TRO"). For the following reasons, the motion will be denied.

I.    Background[1]

TBB "provides international transportation and logistics services as an Ocean Transportation Intermediary" and specializes in logistics services to small and mid-sized businesses. ECF No. 2-1 ¶¶ 7, 12. Polakoff claims that development of its systems has cost "multiple millions of dollars" and "[i]t took a number of years for TBB to develop the

---

[1] The facts are from the complaint, verified by TBB's President Samuel R. Polakoff, ECF No. 1, Polakoff's affidavit, ECF No. 2-1, Bruno's declaration, ECF No. 8-1, and the declaration of Pam Chelden, TBB's Chief Financial Officer, ECF No. 12.

relationships with its customers and underlying supply chain providers and to develop the necessary information regarding these customers and TBB's vendors so as to provide competitive transportation and logistics services." Id. ¶ 13.

ICAT "is a direct competitor of TBB" and "holds itself out to provide international global freight and customs brokerage services similar to those provided by TBB." ECF No. 1 ¶ 29. In 2003, TBB "discovered that ICAT was raiding [TBB's] employees." Id. ¶ 18. TBB "advised ICAT that the employees hired were privy to trade secrets of TBB and that [TBB] had advised those employees of their obligations under the trade secret laws." Id. No litigation arose from this incident.

In 2004, TBB purchased Olimpex International, "a Maryland-based international air freight forwarder, ocean freight forwarder and customs broker." ECF No. 2-1 ¶ 8. Bruno, owner of Olimpex, joined TBB "to work in the development of the international business." Id. ¶ 9; see ECF No. 8-1 ¶ 2. On October 20, 2004, Bruno signed a Confidentiality Statement, agreeing, as a condition of her employment, that

> any information, rates, tariffs, data, figures, project-tions, estimates, customer lists, records, procedures, and the like, shall be considered and kept as the private, confidential, and privileged information of [TBB] and will not be divulged to any person, firm, corporation, or other entity except on the direct authority of the President or Managing Partner of [TBB]. Further, upon termination for any cause, employee agrees and understands that he/she will continue to treat as private, confidential, and privileged

> any information, rates, tariffs, data figures, projections, estimates, customer lists, records, procedures, and the like, and will not release any such information to any person, firm, corporation, or other entity, either by statement, deposition, or as a witness, except upon direct written authority of the President or Managing Partner of [TBB] and [TBB] shall be entitled to an injunction by any competent court to enjoin and restrain the unauthorized disclosure or use of such information.

ECF No. 1-1.[2]

On January 29, 2013, Bruno had an annual performance review with Polakoff. ECF No. 8-1 ¶ 3. By her account, she "received a very favorable performance evaluation," but was "removed from TBB's executive committee[,] and most of [her] accounts [were] transitioned to younger, less expensive account managers." Id. Because commissions were a substantial portion of Bruno's compensation, Bruno negotiated the changes with TBB, agreeing to keep three accounts and "make commission on any new business sold" at three percent of gross revenue for the first year. Id. ¶ 5. Bruno's supervisor told her that her commission plan was "unique." Id.

Chelden declared that Bruno was not on the executive committee, but rather "on the committee that implemented the business strategy adopted by the executive committee." ECF No. 12 ¶ 9. Chelden also asserted that Bruno's new compensation

---

[2] There was also a similar confidentiality provision in the TBB Associate Handbook. ECF No. 1 ¶ 23.

3

package was superior and "would have accounted for higher income than she earned previously."[3] Id. ¶ 10.

Bruno interpreted her change in compensation "as a demotion and pay cut," and began looking for new employment. ECF No. 8-1 ¶ 6. She interviewed with two companies, one of which was ICAT. Id. Nevertheless, Bruno "specifically delayed [her] resignation from TBB out of concern for the impact [her] resignation might have on a pending RFP[4] with one of TBB's largest clients." Id. ¶ 7.

On March 18, 2013, Bruno tendered her resignation to TBB, effective April 1, 2013. ECF Nos. 1 ¶ 32, 8-1 ¶ 8. According to TBB, Bruno explained that "she wanted to spend more time with her family." ECF No. 1 ¶ 32; see ECF No. 12 ¶ 13. Bruno's resignation letter indicated that her "recent demotion and subsequent reduction in compensation . . . made it impossible for [her] to continue [her] employment." ECF No. 8-1 at 10. Bruno declared that she never said anything about spending more time with her family and told Polakoff that she was interviewing with two companies. ECF No. 8-1 ¶¶ 8-9. On April 17, 2013, TBB learned that Bruno had begun employment with ICAT. Id. ¶ 33

---

[3] Chelden did not provide any additional explanation.

[4] Although Bruno did not define "RFP" it likely stands for "request for proposal."

4

During Bruno's employment at TBB, she was a highly placed executive "privy to a substantial amount of confidential information" including customers' names and "information regarding their freight, shipping and receiving points; shipping patterns and order cycles; insurance needs; and other confidential information not generally known to [TBB's] competitors" and "TBB's carriers, vendors, overseas agents, [TBB's] underlying costs and [TBB's] pricing and profit margin." ECF No. 2-1 ¶ 10.

Bruno had remote electronic access to TBB's business information. See id. ¶¶ 19-20. TBB records indicate that in February and March 2013, Bruno

> used temporary storage devices such as travel drives to download TBB information, deleted numerous emails either from or relating to her customer contacts and Business Information, deleted customer folders held on her TBB laptop computer, and had the ability to remove information of TBB to hardware not owned or controlled by TBB.

Id. ¶ 20. Chelden declared that Bruno deleted 700 emails and "Client or Customer folders or files containing information relating to TBB requirements for Customers as well as pricing and costs." ECF No. 12 ¶ 4.

Bruno explained that during her employment at TBB, she worked two days per week at home. ECF No. 8-1 ¶ 12. Because she was not given a company laptop for several years, she used her home computer, "often transferring files between one

computer and another so [she] had proper records." *Id.* Bruno "had been asked to transfer client files to TBB's shared drive" and did so. *Id.* ¶ 13. On April 1, 2013, Bruno returned her laptop, although she "deleted some older files that were useless to make it easier for them to find what they needed." *Id.* On April 2, 2013, Bruno "deleted all TBB files from [her] home computer" and discarded "any flash drives that [she] had used during the course of [her] employment" at TBB. *Id.* ¶ 15. She also deleted TBB contacts from her personal email account. *Id.* ¶ 16. Bruno declared that she "retained absolutely no TBB property, whether tangible or intangible, paper or electronic" and currently possesses no TBB property. *Id.* ¶ 17.

Bruno declared that she does not know "the specific pricing proposals that TBB has made to clients--even for accounts that [she] handled." ECF No. 8-1 ¶ 20. For three larger clients, Bruno provided rate proposals. RFPs and rate proposals are "very detailed, providing rates on multiple lanes,"[5] and thus--according to Bruno--it is impossible to "remember all of the pricings and conditions." *Id.* Bruno has not contacted or shared with ICAT any information about the client on whose RFP she worked immediately before her resignation. *Id.* Bruno worked on RFPs for one other large client "a year ago," and the third "many years ago." *Id.* ¶ 21. She "do[es] not have the

---

[5] It is not clear what a "lane" is.

6

faintest idea of the pricing included in those RFPs." Id. Most other clients had per shipment pricing that was done by a customer service representative; Bruno has no knowledge of such pricing that "would be useful" at ICAT. Id. ¶ 22.

In recent weeks, TBB has learned Bruno has contacted TBB customers "to solicit business on behalf of ICAT." ECF No. 2-1 ¶ 21. It is "aware" that Bruno has used its information "to offer lower rate packages in order to secure the business for ICAT," and "has succeeded in some instances." Id. According to Chelden, ICAT has contacted "a minimum of ten customers." ECF No. 12 ¶ 7. Bruno has also contacted "TBB's vendors and overseas agents in an effort to divert their business from TBB to ICAT." ECF No. 2-1 ¶ 22. Although not directly attributed to Bruno, another TBB employee--privy to TBB's confidential information--recently resigned to take employment with ICAT. Id. ¶ 24.

Polakoff declared that "[i]n the logistics and supply chain business, once you lose a customer, it is difficult to get the business back." Id. ¶¶ 1, 23. Accordingly, he claims that TBB will be irreparably harmed, and monetary compensation "will not suffice." Id. ¶ 23. Chelden declared that TBB "is in jeopardy of losing annual gross revenues of approximately . . . $4,750,000 at this time." ECF No. 12 ¶ 7.

According to Bruno, the customers' identities are common knowledge within the industry. ECF No. 8-1 ¶ 25. Additionally, customers "frequently provide other companies with copies of the pricing they are receiving from . . . their current provider." Id. Further, the identities of prospective customers are public record because of their tracking by U.S. Customs and Border Protection; logistics companies can identify prospective customers from this information, often through third party providers. Id. ¶ 30. Bruno declared that she obtained necessary information to service TBB's customers from the customers themselves. Id. ¶ 26. Further, "[i]t is very rare for a customer to use just one transportation provider. Many of the customers with whom [Bruno has] worked over the years regularly get quotes from more than one transportation provider for each shipment." Id. ¶ 31.

On May 14, 2013, TBB filed a verified complaint for (1) breach of contract (against Bruno), (2) breach of duty of loyalty (Bruno), (3) tortious interference with contractual relations (Bruno and ICAT), (4) tortious interference with economic relations (both), (5) conspiracy to interfere tortiously with contractual relations (both), (6) conspiracy to interfere tortiously with economic relations (both), (7) conspiracy to interfere tortiously with economic relations - TBB

employees (both), (8) misappropriation of trade secrets (both),[6] (9) conspiracy to misappropriate trade secrets (both), and (10) respondeat superior liability (ICAT). ECF No. 1. That day, TBB filed a motion for a TRO and preliminary injunctive relief, attaching Polakoff's affidavit. ECF No. 2. It also sent overnight the complaint and motion to the defendants. ECF No. 5. On May 20, 2013, the defendants opposed the motion and submitted Bruno's declaration and resignation letter. ECF No. 7. The same day, TBB replied, and filed Chelden's declaration. ECF Nos. 11, 12. The parties were unable to agree to a hearing date.

II. Analysis

TBB seeks a TRO restraining Bruno from disclosing TBB's customers, vendors, employees, pricings, routings, or other trades secrets of TBB or from contacting any TBB costumer, vendor or employee with whom Bruno previously dealt. ECF No. 2-2. It bases the motion on its trade secret claim. See ECF No. 3.

To be entitled to a TRO, the movant must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities favors it; and (4) an injunction is in the

---

[6] This count is unclear and may be against only Bruno.

public interest.[7] The movant must show more than a "grave or serious question for litigation"; instead, it bears the "heavy burden" of making a "clear showing that it is likely to succeed at trial on the merits." *Real Truth About Obama*, 575 F.3d at 347, 351. All four elements must be present. *Id.* at 346.

A. Likelihood of Success on the Merits

TBB asserts that it is likely to succeed on the merits of its trade secret claim. ECF No. 3 at 13. Maryland law permits injunctions retraining "actual or threatened misappropriation" of trade secrets. Md. Code Ann., Com. Law § 11-1202(a). Misappropriation means the:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
    (i) Used improper means to acquire knowledge of the trade secret; or
    (ii) At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
        1. Derived from or through a person who had utilized improper means to acquire it;
        2. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

---

[7] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371, *reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010) (per curiam); *General Parts Dist., LLC v. St. Clair*, Civ. No. 11-3556-JFM 2011, WL 6296746, at *2 (D. Md. Dec. 14, 2011) (stating that the standards for a TRO and a preliminary injunction are the same).

> 3. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Md. Code Ann., Com. Law § 11-1201(c). A trade secret is

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* ¶ 11-1201(e).

Maryland courts look to the Restatement of Torts for "helpful guidance" for deciding whether information meets the statutory trade secret definition. *Optic Graphics, Inc. v. Agee*, 591 A.2d 570, 585 (Md. Ct. Spec. App. 1991). The factors for finding a trade secret under the Restatement are:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others

Restatement of Torts § 757 cmt. b (1939).

The defendants contest the validity of the confidentiality agreement, insisting that it is too broad. ECF No. 8 at 10. Although the confidentiality agreement may not be clearly

drafted, it is unreasonable to read it as covering anything other than that information obtained from TBB or in the course of employment with it. See ECF No. 1-1. Further, the defendants frame their argument solely in terms of covenants not to compete, and have not argued or provided any cases indicating when an agreement restricting only disclosure of *trade secrets* is unenforceable. *Id.* at 10-11.

However, even if TBB is likely to succeed in showing that the agreement is enforceable, it still has not shown that it is likely to succeed on the merits. In support of its motion, TBB relies on conclusions. Bruno has provided specifics.

First, TBB has not shown that Bruno has used or otherwise disclosed its confidential information. *See* Md. Code Ann., Com. Law ¶ 11-1201(c). From Bruno's deletion of its information and her contacting its customers, it infers that she must have stolen--and is using--confidential information. *See* ECF No. 3 at 15-16. It has not explained how Bruno's destruction of information allowed her to use it to steal TBB's business.

Bruno, under penalty of perjury, has provided more specific explanations. She deleted older files so that TBB could more easily find what it was looking for and deleted contacts from her personal accounts. ECF No. 8-1 ¶¶ 13, 15-16. She cannot remember specific pricing information about TBB's customers

because of the pricing's complexity.[8] *See, e.g., id.* at ¶ 20. Finally, she specifically states that "At no time in any of [her] conversations with companies with whom [she] worked at TBB [has she] ever used any knowledge that [she] learned either previous to or during [her] employment at TBB." *Id.* ¶ 27.

It is not clear what confidential information Bruno is using or disclosing. She declared that she does not remember pricing information. *See, e.g.,* ECF No. 8-1 ¶ 20. There is also a significant dispute about whether customer identities are actually trade secrets. Although Polakoff implies that customer lists are confidential, *see, e.g.,* ECF No. 2-1 ¶¶ 14, 19, Bruno declared that the identity of potential customers for international shipments is public knowledge, the identity of customers is common knowledge in the business, and clients often share quotes from other companies, *see* ECF No. 8-1 ¶¶ 25, 30. TBB has not clearly shown that it is likely to succeed on the merits.

B. Irreparable Harm

TBB asserts that it will suffer irreparable harm to its business absent injunctive relief. ECF No. 3 at 16. TBB relies on *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir. 1994), in which the Fourth Circuit stated "when the failure to grant preliminary relief

---

[8] There are no examples of pricing calculations in the record.

13

creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Id.* at 552; *see* ECF No. 3 at 20. However, the standard articulated in *Multi-Channel* is too lenient under current Supreme Court precedent. Under *Winter*, TBB must establish the *likely* permanent loss of customers to show irreparable harm. *See Winter*, 555 U.S. at 22; *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 442 F. App'x 776, 785 (4th Cir. 2011) (noting *Winter* changed the *Multi-Channel* standard).

TBB offers only Polakoff's conclusionary statement that "[i]n the logistics and supply chain business, once you lose a customer, it is difficult to get the business back." ECF No. 2-1 ¶ 23. In contrast, Bruno has explained that customers frequently get multiple quotes for each shipment and rarely use a single provider. ECF No. 8-1 ¶ 31.

TBB has not identified any lost clients. Instead, Polakoff swore that Bruno has "secured business [of TBB customers] for ICAT . . . in some instances." ECF No. 2-1 ¶ 21. He does not indicate whether TBB lost all their business. Further, under Bruno's description of the industry, it appears that TBB may be able to secure some future business from those customers. *See* ECF No. 8-1 ¶ 31. Accordingly, TBB has not shown it will likely

14

suffer irreparable harm through the loss of customers.[9] *See Winter*, 555 U.S. at 22; *Signature Flight*, 442 F. App'x at 785; *Multi-Channel*, 22 F.3d at 552. TBB has not shown that it is entitled to a TRO, and the motion will be denied.[10]

III. Conclusion

For the reasons stated above, the motion for a TRO will be denied.

_____5/23/17_____           _____/s/_____
Date                                    William D. Quarles, Jr.
                                                 United States District Judge

---

[9] Additionally, Chelden's assignment of a dollar value to TBB's losses also indicates a lack of irreparable harm. *See* ECF NO. 12 ¶ 7; *Hughes Network Sys., Inc. v. InterDigital Comm'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).

[10] The Court is mindful of the difficulty in weighing the evidence and credibility solely on affidavits and declarations, but TBB's conclusionary assertions are insufficient to show its entitlement to injunctive relief. If TBB has additional--and not conclusionary--evidence that could sustain a preliminary injunction in light of this Memorandum Opinion, it should file an appropriate motion and propose acceptable times for a hearing.